1

1

2

3            IN THE UNITED STATES DISTRICT COURT

4                    DISTRICT OF ARIZONA

5

UNITED STATES OF AMERICA,        )
6                                )   CR 07-1838-TUC-RCC
            Plaintiff,           )
7                                )
vs.                              )
8                                )   October 23, 2007
DONALD BIARD MACGUINEAS,         )   Tucson, Arizona
9                                )
            Defendant.           )
10

11
                    DETENTION HEARING
12

13         BEFORE:  HONORABLE HECTOR ESTRADA
              UNITED STATES MAGISTRATE JUDGE
14                   405 W. CONGRESS
                 TUCSON, ARIZONA 85701
15

16              A P P E A R A N C E S

17     FOR THE GOVERNMENT:  MS. BEVERLY ANDERSON, ASSISTANT
UNITED STATES ATTORNEY.
18
       FOR THE DEFENDANT:  MR. RAUL MIRANDA, ATTORNEY AT LAW.
19

20

21          PROCEEDINGS WERE DIGITALLY RECORDED
22

23         TRANSCRIBED BY:  Dianne Davenport
              405 W. Congress, Suite 1500
24               Tucson, Arizona 85701
                   (520)205-4266
25

2

WITNESS INDEX

WITNESS                                                    PAGE

MARTY NEWMAN, M.D.

Direct Examination by Ms. Anderson                            5
Cross-Examination by Mr. Miranda                            20
Redirect Examination by Ms. Anderson                        28
Examination by the Court                                    29
Recross-Examination by Mr. Miranda                          30

SCOTT HOLTZ

Direct Examination by Ms. Anderson                          31
Cross-Examination by Mr. Miranda                            39
Redirect Examination by Ms. Anderson                        40

EXHIBIT INDEX

EXHIBIT                                        OFFERED ADMITTED

1                                                 17        18
2                                                 11        12

MISCELLANEOUS

PROCEEDING                                                 PAGE

Government Argument                                          41
Defense Argument                                            44
Court's Ruling                                              45

P R O C E E D I N G S

1

2       (Call to order of court.)

3       THE CLERK:  CR 07-1838, Donald Biard MacGuineas, on

4 for detention and preliminary hearing.

5       Counsel, please state your appearance.

6       MS. ANDERSON:  Good morning.  Beverly Anderson for

7 the United States.

8       THE COURT:  Good morning.

9       MR. MIRANDA:  Raul Miranda, Your Honor, for Donald

10 Biard MacGuineas who is in custody.

11       THE COURT:  Good morning.

12       This is the time set for a preliminary hearing.  How did

13 Mr. MacGuineas wish to proceed?

14       MR. MIRANDA:  Well, Your Honor, I think we would waive

15 that hearing but this was continued last time, and based on issues that

16 are expected to be determinative of mental competency, we would

17 waive the preliminary hearing at this time with the ability after that to

18 reraise the issue should that happen and probably by that time he

19 would be indicted anyway.

20       THE COURT:  All right.  It is also the time set for a

21 detention hearing.  I will hear from the government first regarding a

22 recommendation.

23       MS. ANDERSON:  Your Honor, the government

24 recommends detention based on the fact that we believe the defendant

25 is a danger to the community and also a risk of flight.

1               We have three witnesses, Your Honor, who are here and

2    prepared to testify on that issue.

3               THE COURT:  Mr. Miranda.

4               MR. MIRANDA:  Your Honor, I have read this

5    preliminary -- this report that was drafted October 20.  Today I just

6    received the supplemental report number one.  And in the report it

7    contains information from treating physicians at Pima County

8    concerning his status and they are recommending detention as well.

9               I would like to hear from, you know, the testimony of at

10   least one of those physicians today to be able to determine -- just to

11   ask them a few questions about this.

12              THE COURT:  All right then.  Ms. Anderson, if you would

13   call your first witness.

14              MS. ANDERSON:  Yes, Your Honor.

15              THE COURT:  Is anyone invoking the rule?

16              MR. MIRANDA:  Yes, Your Honor.  I would invoke the

17   rule.

18              THE COURT:  Would you have your witnesses come up so

19   they can be sworn in.

20              MS. ANDERSON:  Your Honor, may my case agent remain

21   in the courtroom with me?

22              THE COURT:  Certainly.

23              MS. ANDERSON:  Dr. Newman.  Actually, Your Honor, it's

24   Dr. Newman who will be the first witness and Dr. Stoker will be the

25   second witness.  So we need Dr. Stoker to be sworn.

1    MR. MIRANDA:  Your Honor, may I ask that people who

2    are not associated with this case be asked to leave the courtroom for

3    the confidential nature of this testimony based on my client's privacy

4    rights.

5    THE COURT:  Ms. Anderson.

6    MS. ANDERSON:  Your Honor, we have some people here

7    in the courtroom from Kino Hospital who have accompanied the two

8    physicians here this morning.  They are physicians themselves who are

9    here to observe and learn from the proceeding and the government

10   would request that they be allowed to stay.

11   THE COURT:  All right.  Defendant's request is denied at

12   this time.

13   Call your first witness.

14   MS. ANDERSON:  Government calls Dr. Newman.

15   MARTY NEWMAN, M.D., GOVERNMENT WITNESS, SWORN

16   MS. ANDERSON:  May I proceed?

17   THE COURT:  Certainly.

18   DIRECT EXAMINATION

19   BY MS. ANDERSON:

20   Q.    Could you tell us your name, sir.

21   A.    Good morning.  Marty Newman, M.D.

22   Q.    What do you do for a living?

23   A.    A physician licensed here in the state of Arizona to practice

24   medicine and I specialize in psychiatry.

25   Q.    How long have you been practicing medicine?

1  A.     I was in New York City, Columbia University and St. Luke's-

2  Roosevelt hospitals, 2002.  I've been here since April of this year.  And

3  that is when I was licensed here in the state of Arizona to practice

4  medicine here.

5  Q.     Specifically where do you work, Dr. Newman?

6  A.     UPH Kino Hospital and University of Arizona where I have

7  privileges to teach as an assistant professor.

8  Q.     How long have you held this position?

9  A.     Since beginning of May.

10  Q.     Beginning of what?

11  A.     May.

12  Q.     May of this year?

13  A.     That's right.

14  Q.     Can you tell us what your duties are in your position?

15  A.     I'm a clinical psychiatrist.  I evaluate patients for Title 36

16  court-ordered evaluation and petitions.  I also have the responsibility to

17  patients for ongoing care and initial psychiatric evaluation and

18  recommendation and consults in the hospital.

19  Q.     Now, Title 36 is a state statute, correct?

20  A.     That's right.

21  Q.     Could you explain to us what Title 36 is?

22  A.     Surely.  Title 36 is a procedure whereby patients who are

23  petitioned to our hospital for evaluation within a period of 72 hours to

24  determine whether or not they are appropriate for court-ordered

25  treatment.

1        Court-ordered treatment typically falls into four different

2   categories including persistently and acutely disabled, danger to others,

3   danger to self, and gravely disabled.

4        The patients are evaluated by two physicians,

5   independent evaluators, and it is determined through team meetings,

6   our evaluation and also the attending physician whether or not the

7   patient is appropriate for court-ordered treatment.

8        If we believe that's the case, the patient is then

9   presented at hearing and evidence is then presented to the court and it

10  is then determined whether or not the patient is appropriate at that

11  point for ongoing court-ordered treatment.

12       And depending on whether or not the patient has been

13  deemed persistently and acutely disabled, danger to self, danger to

14  others, or gravely disabled determines the period of time that they are

15  under court-ordered treatment within the community.

16  Q.    Now, could you briefly describe for us your formal education and

17  training that allows you to conduct these evaluations?

18  A.    Uh-huh.  I was trained as a physician at MCP Hahneman

19  University in Philadelphia which is now currently Drexell University

20  School of Medicine.  I attended Columbia University and St. Luke's-

21  Roosevelt hospitals for further training in areas of psychiatry and I have

22  continued my practice here.

23  Q.    Dr. Newman, did you have occasion to evaluate an individual by

24  the name of Donald Biard MacGuineas?

25  A.    I did.

1   Q.    Do you see him in the courtroom today?

2   A.    I do.

3   Q.    Can you point to him and tell us what he is wearing?

4   A.    He is the gentleman sitting next to the defense counsel at the

5   desk in front of me dressed in an orange jumpsuit.

6              MS. ANDERSON:  May the record reflect identification of

7   the defendant?

8              THE COURT:  So noted.

9   BY MS. ANDERSON:

10   Q.    Dr. Newman, you evaluated Mr. MacGuineas, did you not?

11   A.    I did.

12   Q.    Why were you asked to evaluate him?

13   A.    Pursuant to the petition for a Title 36 evaluation.

14   Q.    That's Title 36 as you have previously described for us?

15   A.    Exactly.

16   Q.    Now, how did you evaluate Mr. MacGuineas?

17   A.    My evaluation takes place in the hospital on the unit floor over a

18   period of time, the interview process along with review of the

19   allegations within the petition themselves.  We review treatment

20   options.  We review his history.  I also gather collateral information

21   which includes information from family, acquaintances, and the medical

22   record.

23   Q.    What were the allegations in the petition pertaining to Mr.

24   MacGuineas?

25   A.    Allow me to take a look at this, please.

1  Q.     Go ahead.

2  A.     Let me see if I have them in here.  Usually what I will do is

3  include them in my history of present illness.

4            In the first paragraph of my court psychiatric evaluation,

5  I usually review the allegations, and in that paragraph it states, as per

6  the allegations, they allege the patient is intending to bomb certain

7  buildings and shoot schoolchildren with a machine gun.  The patient

8  has made ongoing threats, threats of harm or death to others per

9  e-mail.  He has an anxiety disorder.  The patient stated he intended to

10  bomb certain buildings and shoot schoolchildren with a machine gun.

11  Subject has made numerous threats of killing and threats to injure

12  family members, doctors, and the government as a whole, and reports

13  of threats of death, torture and bombing.

14  Q.     Those are the allegations in the petition itself, correct?

15  A.     Yes.

16  Q.     Okay.  And could you tell us specifically what you did to evaluate

17  Mr. MacGuineas?

18  A.     I reviewed the allegations with the patient and conducted an

19  interview process whereby I was assessing the allegations, his

20  perception of the allegations.  Also conducting a mental status

21  examination in the process of the interview which in psychiatric terms

22  is what an internal medicine doctor may do with a stethoscope is what

23  we do in our interview process.

24            While this is conducted, I determine whether or not it

25  would be in my best interest to see him again and which I did.  I

1    believe I visited him a total of three times while he was on the unit.

2              I then, after the interview process is done, I evaluate

3    what would be appropriate for a differential diagnosis and then pursue

4    collateral information by looking through the medical records that we

5    have on hand and contacting family, acquaintances and so forth to

6    understand what may be going on outside of this specific environment

7    that we are in at this point and what their perception of the individual

8    may be as well.

9    Q.    How long did you actually spend with Mr. MacGuineas speaking

10   with him?

11   A.    I usually spend anywhere between 45 minutes to an hour and 15

12   minutes with a patient initially.  However, with Mr. MacGuineas I believe

13   that we were at the extended end of that period of time.  It was

14   somewhere around an hour and 15 minutes or over an hour.

15             The second time I met with him, I spent approximately

16   45 minutes with him.  And I spent a little bit less time with him on the

17   third visit.

18   Q.    In addition to speaking with him, you also reviewed some

19   material, correct?

20   A.    Right.

21   Q.    Was one of the items that you reviewed a series of e-mails?

22   A.    Yes.

23   Q.    That had been sent from Mr. MacGuineas to his sister, Maya

24   MacGuineas?

25   A.    Yes, I reviewed those e-mails.  And I also reviewed a number of

1    e-mails that were retained by a relative of his who had faxed them to

2    our facility for me to review as well.

3                    MS. ANDERSON:  Your Honor, may I approach the

4    witness?

5                    THE COURT:  Certainly.

6    BY MS. ANDERSON:

7    Q.    Dr. Newman, that is Government's Exhibit 2.  Do you recognize

8    those series of documents?

9                    MR. MIRANDA:  May I inquire if this is the same series of

10   documents that were provided to me earlier in this case?

11                   MS. ANDERSON:  Yes, they are.  They were disclosed to

12   the defense two weeks ago at the original detention hearing.

13                   THE WITNESS:  Yes, I recognize these.

14   BY MS. ANDERSON:

15   Q.    You recognize them as being what?

16   A.    These were the e-mails -- these were a portion of the e-mails

17   that were -- that I had reviewed as part of the record.  And these were

18   the e-mails that were sent by Mr. MacGuineas to his family.  He has the

19   identification of an e-mail identification which I have seen through this

20   as well as the list of individuals that he sends these e-mails to as

21   friends and family.

22   Q.    Did you rely in part on the content of what is in Exhibit Number

23   2?

24   A.    Yes.

25                   MS. ANDERSON:  Government moves for admission of

1    Exhibit Number 2.

2                    THE COURT:  Mr. Miranda, any objection?

3                    MR. MIRANDA:  No objection, Your Honor.

4                    THE COURT:  So admitted.

5    BY MS. ANDERSON:

6    Q.    Now, you told us that you also obtained some collateral material

7    and that you spoke with relatives.  Is that correct?

8    A.    That's correct.

9    Q.    Now, did you make a determination whether or not Mr.

10   MacGuineas' issues had been ongoing for some time?

11   A.    I did.

12   Q.    And what was your conclusion regarding the longevity of his

13   issues?

14   A.    They had been ongoing for quite some time.

15   Q.    Did you speak with Maya MacGuineas who is the sister of the

16   defendant?

17   A.    I did.

18   Q.    What did she relay to you, if you recall?

19   A.    She had relayed to me numerous incidents from the past along

20   with personally witnessed psychotic delusional symptoms and threats

21   along with a history of delusional somatiform-type issues whereby he

22   was pursuing numerous medical doctors to explain one symptom or

23   another.

24                    We also reviewed his educational history, the incident

25   involving the death of his mother, his travel, and admissions and

1    evaluations at a hospital in Bethesda, Maryland.

2    Q.    Did Ms. MacGuineas indicate that she was concerned for her

3    safety?

4    A.    Yes.

5    Q.    Did Ms. MacGuineas express concern for the safety of the

6    community?

7    A.    She did.

8    Q.    When was it that you evaluated Mr. MacGuineas?

9    A.    My initial evaluation with him was on September 7, 2007.

10   Q.    And you said that you saw him on a couple of different occasions.

11   Is that correct?

12   A.    Uh-huh, yes.

13   Q.    When was your evaluation of Mr. MacGuineas complete?

14   A.    My evaluation of him was complete prior -- approximately three

15   to four days of his hearing.

16   Q.    Prior to his hearing?

17   A.    That's right.

18   Q.    And when was his hearing?  Do you recall?

19   A.    It's hard to say.  Let me see.  I believe that would be in the

20   medical records somewhere.  I can't recall off the top of my head.

21   Q.    That was sometime in September.  Is that correct?

22   A.    I would imagine, yeah.

23   Q.    Dr. Newman, after you evaluated Mr. MacGuineas, what were

24   your conclusions?

25   A.    Well, my first conclusion was that he had a somatiform disorder

1   and general anxiety disorder.  This was prior to my further investigation

2   of the collateral information and observing him on the unit and

3   speaking to him a couple of more times after that.

4               Ultimately, his diagnosis was schizoaffective disorder  and

5   personality disorder and OS.

6   Q.    And OS?

7   A.    Yes.  Not otherwise specified.  Usually it's -- it allows the

8   combination of more than one characterological trait under that

9   heading.  Nobody is diagnosed with one specific personality disorder.

10   It's a collection of a few traits.

11   Q.    Any other diagnosis?

12   A.    No.

13   Q.    Now, in terms of Title 36, what are your opinions regarding Mr.

14   MacGuineas and his medical condition, his psychiatric condition?

15   A.    He is persistently and acutely disabled and a danger to others.

16   Q.    And it's your -- that's your opinion beyond a reasonable medical

17   certainty, correct?

18   A.    Correct.

19   Q.    And did you testify as such at the defendant's mental hearing in

20   September of this year?

21   A.    I did.

22   Q.    And what was the result of that hearing?

23   A.    He was deemed -- I don't have the minutes in front of me, but I

24   do believe that he was deemed as persistently and acutely disabled and

25   a dangers to others.  I'm not quite sure or I don't recall whether or not

1    the status of danger to self was included.

2    Q.      Do you know Dr. Platcova (phonetic)?

3    A.      I do.

4    Q.      Who is Dr. Platcova?

5    A.      She's an attending physician, psychiatrist at UPH Kino.

6    Q.      Before I get into some of her opinions, let me ask you, you

7    evaluated the defendant back in September and here we are in

8    October.  Has your opinion changed regarding Mr. MacGuineas and his

9    mental condition?

10   A.      Unless somebody can show me some clear and concise evidence

11   than otherwise, I would not have changed my opinion at this point.

12   Q.      So it's still your opinion that he is persistently and acutely

13   disabled?

14   A.      Yes.

15   Q.      And it's still your opinion that he is a danger to the community?

16   A.      Yes.

17   Q.      Let's talk about Dr. Platcova.  Is she a colleague of yours?

18   A.      She is.

19   Q.      Did she evaluate Mr. MacGuineas?

20   A.      She did.

21   Q.      What is her specialty?  Do you know?

22   A.      Psychiatry.

23   Q.      Was she the attending?

24   A.      She was.

25   Q.      Have you had a chance to review Dr. Platcova's discharge

1  summary?

2  A.    I did.

3            MS. ANDERSON:  Your Honor, may I approach the

4  witness?

5            THE COURT:  Certainly.

6  BY MS. ANDERSON:

7  Q.    Dr. Newman, do you recognize Government's Exhibit Number 1?

8  A.    Yes.

9  Q.    What do you recognize that as being?

10  A.    Well, the first page includes the addendum for the discharge

11  summary which articulates the report from our radiology department

12  when we conducted a CT scan of his head with and without contrast.

13            The second page begins the discharge summary for Mr.

14  MacGuineas.

15  Q.    This was authored by Christine Platcova, M.D, correct?

16  A.    Correct.

17  Q.    And the date of the discharge summary is October 3 of this year?

18  A.    That's correct.  October 3, 2007.

19  Q.    Now, she did not sign this report, correct?

20  A.    This specific report, no.  However, you must allow me to

21  elaborate on that.

22            This is a report that is generated through our

23  transcription service.  It's computerized.  And these reports can be

24  printed out of the system.  But the signature is an electronic signature.

25  So she needs -- she enters her pass code in and hits enter and her

1  signature is automatically printed out on the report.  So ultimately it

2  has been signed.

3  Q.    All right.  You've reviewed this report, have you not?

4  A.    I did.

5  Q.    You discussed it with Dr. Platcova, correct?

6  A.    I did.

7  Q.    Let me call your attention to page 4.

8           MS. ANDERSON:  First of all, the government moves for

9  admission of Exhibit Number 1, Your Honor.

10          THE COURT:  Mr. Miranda.

11          MR. MIRANDA:  I would object to this because it is

12  unsigned and we have no verification that it was signed other than the

13  doctor saying that it should have been signed.

14          MS. ANDERSON:  Your Honor, the purpose in bringing

15  this up is that a portion of it is quoted in the pretrial services report

16  which is dated October 20 and because of that I felt the need to ask Dr.

17  Newman about it.

18          THE COURT:  Would it serve to establish the foundation

19  for his opinion?

20          MS. ANDERSON:  Actually, no.  It explains a portion.  I

21  intend to ask him to explain a portion of her report which is cited in the

22  pretrial services report.  Let me point it out to you specifically.

23          THE COURT:  It is on page 6.

24          MS. ANDERSON:  Page 6.  Dr. Platcova is out of the

25  country and unavailable for the hearing.  Dr. Newman has discussed

1    with Dr. Platcova her report and specifically this portion in the -- that

2    appears in the pretrial services report.

3                    THE COURT:  I'm not saying he is adopting that opinion.

4    I'm saying he has reviewed it.  He has analyzed it.  And it goes to serve

5    his reasons for why it is he has concluded in distinguishing in that

6    manner.  Is that correct?

7                    MS. ANDERSON:  That's correct.

8                    THE COURT:  Defendant's objection is overruled.

9    BY MS. ANDERSON:

10   Q.    Dr. Newman, I'm calling your attention to Government's Exhibit

11   Number 1 which has been admitted.  Specifically take a look at page 4

12   of Dr. Platcova's report, the second-from-the-last paragraph.  Do you

13   see that?

14   A.    The paragraph that begins with "By the time"?

15   Q.    Yes, sir.

16   A.    Yes.

17   Q.    Let me read it for the record.  It says, "By the time the patient is

18   going to be discharged, his mood seems improved.  His affect is not

19   congruent with mood.  The patient does not seem to be responding to

20   internal stimuli.  He does not seem to be preoccupied.  He denies any

21   perceptual disturbances.  He does not seem to be a danger to self or

22   others."

23                    Do you see that there?

24   A.    I do.

25   Q.    Dr. Newman, have you had the occasion to discuss this particular

1  paragraph with Dr. Platcova?

2  A.     I did.

3  Q.     Now, it appears the very last sentence of that paragraph indicates

4  he does not seem to be a danger to self or others, correct?

5  A.     Correct.

6  Q.     Did you discuss that sentence with Dr. Platcova?

7  A.     I did.

8  Q.     And what was -- what did she tell you regarding the sentence

9  that she put in there?

10  A.     That the circumstances of his discharge were unique in the sense

11  that he was being released to custody with law enforcement and was

12  being transported to another facility that was locked and that under

13  these circumstances she did not see him as being a danger to self or

14  others.  Under other circumstances, being released to his own devices

15  within the community, that would not be the case.

16  Q.     Now, did the fact that he was released indicate that he is no

17  longer a danger to the community?

18  A.     No.

19  Q.     Why is that?

20  A.     Because he was still in custody.  The patient in turn has been and

21  had been on medications at the time.  He was also receiving

22  intramuscular injections for psychosis and antipsychotic medication

23  which has a longevity of approximately two weeks where he would

24  need to take that medication every two weeks to maintain his health.

25  The reason that it was done is because he is a high risk for

1    nonadherence with treatment.

2              Thus, released out into the community to his own

3    devices, he was a high risk for nonadherence and thus that is why he

4    was administered IM medications prior to his discharge.  That was part

5    of the treatment plan.

6    Q.    Based on everything that you have learned regarding

7    Mr. MacGuineas, do you have an opinion regarding whether or not he is

8    a danger to the community?

9    A.    Yes.

10   Q.    What is your opinion?

11   A.    That he is.

12             MS. ANDERSON:  Judge, may I have just a moment?

13             THE COURT:  Certainly.

14             MS. ANDERSON:  Judge, that is all I have of this

15   witness.

16             THE COURT:  Thank you.

17             Mr. Miranda.

18                     CROSS-EXAMINATION

19   BY MR. MIRANDA:

20   Q.    Dr. Newman, how are you doing?

21   A.    Good morning, sir.

22   Q.    Now, you mentioned somatiform disorder.  You understand that

23   Mr. MacGuineas had a long-going dispute with his parents and sister for

24   quite some time before any of these incidents.  Were you aware of

25   that?

1    A.    Can you repeat that again?

2    Q.    Were you aware that prior to his admission to Pima on this arrest

3    for evaluation he had had a long-going dispute with his parents over

4    their perceived inability to believe that he had an illness, some kind of a

5    problem?

6    A.    Yes.

7    Q.    How long were you -- were you told that by his sister, Maya?

8    A.    And his father.

9    Q.    And his father?

10   A.    Yes.

11   Q.    And how long did they tell you he had had this dispute with

12   them?

13   A.    I can't say exactly.  I don't recall the exact period of time.

14   Q.    Would you --

15   A.    It was an extended period of time.

16   Q.    Over a year?

17   A.    Oh, yes.

18   Q.    Many years?

19   A.    Over a year.

20   Q.    And that had to do with his perception that he had a problem

21   inside his mouth that he thought could be cancerous, some sort of a

22   lesion that was causing him severe pain, correct?

23   A.    No, that's not correct.

24   Q.    What is correct then?

25   A.    He had numerous complaints.  They weren't simply just a lesion

1    in his mouth.  That was the latest one.  He had other complaints prior

2    to that with multiple pseudodiagnostic relevance from his perspective.

3            He had at one time believed he had Lyme disease.  At

4    one time he believed he had an infectious process that traveled from

5    his gums into his brain.  He had multiple, multiple issues that he had

6    taken to numerous physicians over a period of time.

7            The lesion on the right aspect of his tongue back towards

8    the tonsil or fossa was a recent event and he had sought out numerous

9    opinions regarding that including ourselves.

10   Q.    Well, most recently, the dispute with his parents -- father and

11   sister involved that particular lesion, did it not?

12   A.    His latest -- it could.  It could have.

13   Q.    And they basically told him that he didn't -- they actually took

14   him to a doctor when he was in Washington, D.C. and came back and

15   they didn't find anything wrong there, correct?

16   A.    Correct.

17   Q.    And when he came back here, they actually did find something

18   wrong here, a doctor here in Tucson.  Is that correct?

19   A.    As per the patient.  The patient -- I requested from the patient

20   the name of the physician who had found something wrong which I

21   cannot corroborate at this point because the patient, Mr. MacGuineas,

22   would not offer me the information that I needed to follow up with that.

23           I asked him for the physician's name.  He wouldn't give it

24   to me.  He stated to me that a biopsy was supposed to be done by this

25   physician here in Tucson.  He had never got it done.  I offered Mr.

23

1   MacGuineas the opportunity to contact the physician and have the

2   biopsy done here by him.  He refused to do it.  I also asked whether or

3   not we can go ahead and get a biopsy done here as well.  He refused to

4   do that.

5              I had got a radiological study done, a CT of his head with

6   both contrast and no contrast, and it showed -- it had negative results.

7   The only thing we could find was a previous procedure that may have

8   been done on his ethmoid sinuses and a retracted polyp within that

9   location.

10  Q.    I was under the impression from reading this report that they had

11  actually found a lesion.  There was no biopsy done on it as you

12  described, but there was a lesion, correct?

13  A.    The study that was done by us and the physical exam that was

14  conducted by us was determined to be more of a hyperplastic taste bud

15  which basically means it is an enlarged taste bud.  That was the extent

16  of it.

17  Q.    There was something there, right?

18  A.    Well, yeah.

19  Q.    Out of the ordinary?

20  A.    Not so unordinary.

21  Q.    For a person who has never had one, it would be out of the

22  ordinary for him to have it, wouldn't it?

23  A.    For someone who hasn't had one, yes.

24  Q.    So from Mr. MacGuineas' perspective, you know, that was a valid

25  concern of his that his parents had basically rejected outright.  Is that a

1    fair statement?

2    A.    It was in contrast to the explanations that he was giving for it.

3    That is what was the dispute.

4    Q.    Now, Dr. Platcova, she works for University Physicians?

5    A.    Yes.

6    Q.    You do not.  Is that correct?

7    A.    Pardon?

8    Q.    You are not part of that group, are you?  Are you part of

9    University Physicians?

10   A.    I am.

11   Q.    Okay.  Why were we unable to get the records prior to this

12   hearing from University Physicians?

13   A.    I can't explain that.

14   Q.    And why were we unable to get a signed copy of Dr. Platcova's

15   report if it was just a matter of a computer stroke to get that?

16   A.    I can't explain that either.  That would have to be taken up with

17   medical records.

18   Q.    These are not -- I mean, you can't use reports that are unsigned

19   as a reliable opinion in a court of law?

20   A.    I can't answer that question.

21   Q.    Do you use them unsigned from other physicians?  In your

22   practice if you receive a report that is unsigned, do you give it

23   credibility?

24   A.    If it is corroborated by the physician.

25   Q.    And what evidence do you have that this was corroborated by Dr.

1   Platcova?

2   A.     Because I speak to her daily.

3   Q.     So you have hearsay testimony that she told you this.  Is that

4   correct?

5   A.     No.

6   Q.     Okay, what evidence do you have then?

7   A.     I think that if we were to take the time to go back into the

8   records, you will find that somewhere within the records there is the

9   same report that is signed.

10   Q.     You don't know that for a fact?

11   A.     Not for a fact.

12   Q.     I call your attention to the last page of the report, the discharge

13   condition, the very last paragraph of the report from UPH, Dr.

14   Platcova's unsigned report which was admitted as Exhibit 1.  It says,

15   "Discharge condition.  Currently it should be known that the patient

16   does not seem to be dangerous to self or others.  He has denied any

17   suicidal or homicidal ideation."

18            It goes on to say that "He is not responding to any

19   internal stimuli and patient is safe to be picked up by the FBI and stable

20   mentally to be picked up by the FBI today."

21            Now, that doesn't qualify -- you agree that statement

22   does not qualify only he is not a danger to himself or others as long as

23   he is picked up by the FBI.  It doesn't say that, does it?

24   A.     No, it doesn't say that.

25   Q.     So your basis for saying that is your opinion of Dr. Platcova's

1    opinion as she reported to you?

2    A.    Dr. Platcova's opinion.

3    Q.    She specifically said that to you, that he was not -- that she

4    would change that if he was not going to be picked up by the FBI?

5    A.    Right.  Paraphrasing it in your way.

6    Q.    Do you have any interaction with social workers who are involved

7    in this process of discharge and custody at your facility?

8    A.    Say that again.

9    Q.    Are you involved with the social workers who are involved in

10   these cases that take the people to or pick them up from or to them in

11   their discharge?

12   A.    Sure.

13   Q.    Are you aware that in this case a social worker gave Mr.

14   MacGuineas cab fare to go home and it was her understanding that he

15   was going to be discharged to go home?

16   A.    I would not be aware of that.  I would not be aware of that

17   because of the fact that I was not his attending.

18   Q.    So you spent a total of about two and a half hours with him.  Is

19   that correct?

20   A.    I would estimate somewhere around there.

21   Q.    How much time did Dr. Platcova spend with Mr. MacGuineas?

22   A.    She would have seen him on a daily basis.

23   Q.    So she would have seen him much more often, a lot more hours?

24   A.    Sure.

25   Q.    Now, obviously she's a very educated woman and very well

1  trained in her profession, correct?

2  A.    I would imagine.

3  Q.    So when she writes something like this "Currently it should be

4  known that the patient does not seem to be dangerous to self or

5  others," period, why wouldn't she amplify that with what you reportedly

6  say that she told you?

7           MS. ANDERSON:  Objection, foundation.

8           THE COURT:  Overruled.

9           THE WITNESS:  For the -- I can't possibly know exactly

10  why she did what she did, but I know that she was within the treatment

11  team three times a week regarding Mr. MacGuineas.  And we had

12  believed that Mr. MacGuineas wouldn't be at a minimum ready for

13  discharge into the community without at least 45 days of ongoing

14  medication treatment.

15           Under the circumstances she must have believed that he

16  was safe to leave within the custody and the conditions that he was

17  being discharged in.

18           Dr. Platcova is a new member of our staff.  During this

19  period of time, I believe that she was going through a lot of transition,

20  gaining experience in our way of working at the hospital and learning

21  the systems.  I cannot explain why she would do that.

22  BY MR. MIRANDA:

23  Q.    So you would agree that on its face that document is saying that

24  he was safe to go into the community?

25  A.    No.

1    Q.    That is what that sentence says, right?

2    A.    That is what the sentence says.  But the spirit of the treatment at

3    the time was not that case.

4    Q.    Then why is Dr. Platcova not available to testify here today?

5    A.    She is in Europe.

6    Q.    Europe?

7    A.    Yes.

8    Q.    So we could get her.  When will she be returning?

9    A.    I don't know exactly.  She should be gone a week to ten days.

10              MR. MIRANDA:  I have no further questions.

11              THE COURT:  Thank you.

12              Ms. Anderson, any redirect?

13                    REDIRECT EXAMINATION

14    BY MS. ANDERSON:

15    Q.    Dr. Newman, does the fact that there was a dispute between the

16    defendant and his parents change your opinion that the defendant is a

17    danger to the community?

18    A.    No.

19    Q.    One of the conditions of discharge -- a second ago you were

20    talking about Dr. Platcova and her opinions and the conditions of

21    discharge.  And the conditions of discharge was that he was going into

22    the custody of FBI, correct?

23    A.    That's correct.

24    Q.    You all believed he was going to be detained in some kind of

25    detention facility, correct?

1    A.    Absolutely.

2    Q.    And those were the circumstances under which he was approved

3    for discharge.  Is that right?

4    A.    That was my understanding.

5                   MS. ANDERSON:  That is all I have.

6                   THE COURT:  May I see Government's Exhibit Number 1.

7                   As far as the question of Dr. Platcova's reference to his

8    denying any homicidal ideation, was that based on his self-reporting?

9                   THE WITNESS:  That would be.

10                  THE COURT:  Did you in your evaluation and study of this

11   gentleman have anything that would contradict that, any information

12   that would contradict that?

13                  THE WITNESS:  Including collateral information?

14                  THE COURT:  Any information whatever source derived.

15                  THE WITNESS:  Of course.  Within the content of the

16   e-mails that had been sent, there were numerous threats in there.  He

17   denied to me homicidal ideation.  However, he also admitted to me

18   during our interviews that he is a follower and a supporter of Timothy

19   McVeigh and his ideas and ideals and actions.

20                  He had also articulated to me that he was a follower of

21   Charles Manson as well.

22                  His threats to his family included within the e-mails,

23   which is a poor contrast in this material here, a picture as an

24   attachment of the automatic weapons that he had in his house and sent

25   that as an attachment along with the threats.

1          Taking everything into consideration and looking at the
2   patient as a whole, I had to determine that he was a danger to others.
3          THE COURT:  Thank you.
4          Either counsel have any questions as to follow up to what
5   I asked Dr. Newman?
6          MS. ANDERSON:  No, Your Honor.
7          THE COURT:  Mr. Miranda?
8          MR. MIRANDA:  Yes, Your Honor.  I would.
9                          RECROSS-EXAMINATION
10  BY MR. MIRANDA:
11  Q.     This is the first I heard about Timothy McVeigh and Charles
12  Manson.  Why doesn't that show up on any of the records?
13  A.     I think you would find it within the transcripts and as reported
14  during the Title 36 hearing as part of the interview process in the web
15  sites and blogs that he had produced on the Internet.  It should be
16  included in the record as printouts.
17  Q.     So it's not before this court today, correct?  I don't have it.
18  A.     I don't know.
19  Q.     Okay.  What about -- he's never told you that Dr. Cohen was the
20  person -- he never gave you the name of Dr. Cohen, the person he was
21  seeing about his lesion?
22  A.     That's the first time.
23          THE COURT:  I think that is beyond the scope of what he
24  just testified to under my questions.
25  BY MR. MIRANDA:

1   Q.     So when can we see these records that you just mentioned?

2   A.     I can't tell you that.

3                  MS. ANDERSON:  Objection, Your Honor, foundation.

4                  MR. MIRANDA:  Nothing further.

5                  THE COURT:  Sustained.

6                  Thank you for your testimony, sir.

7                  THE WITNESS:  My pleasure.

8                  THE COURT:  Government wish to call any more

9   witnesses?

10                 MS. ANDERSON:  Your Honor, the government would call

11  FBI Agent Scott Holtz.

12            SCOTT HOLTZ, GOVERNMENT WITNESS, SWORN

13                         DIRECT EXAMINATION

14  BY MS. ANDERSON:

15  Q.     Sir, could you tell us your name.

16  A.     Scott Holtz.

17  Q.     What do you do for a living?

18  A.     I'm a special agent with the Federal Bureau of Investigation.

19  Q.     How long have you been so employed?

20  A.     Approximately five and a half years.

21  Q.     Could you explain to us how you got involved in this case?

22  A.     The government's exhibit I believe Number 2 was forwarded to

23  me from the FBI field office in Baltimore.

24  Q.     Those are the e-mails.  Is that correct?

25  A.     Correct.

1        MS. ANDERSON:  Judge, do you have those?

2        THE COURT:  Certainly.

3        MS. ANDERSON:  I am hoping that you do have those in

4    front of you, both 1 and 2.

5        THE COURT:  Yes.

6        MS. ANDERSON:  Thank you.

7    BY MS. ANDERSON:

8    Q.    Now, what information was obtained by the FBI office in

9    Baltimore when you began getting involved in this case?

10   A.    Those e-mails had been forwarded to the FBI office in Baltimore

11   by Maya MacGuineas because she feared for her safety, her family's

12   safety and the safety of the community.

13   Q.    And you obtained those e-mails, did you not?

14   A.    I did.

15   Q.    You have reviewed those e-mails, correct?

16   A.    I have.

17        MS. ANDERSON:  Your Honor, may I approach the

18   witness?

19        THE COURT:  Certainly.

20        MS. ANDERSON:   That is an identical copy of

21   Government's Exhibit Number 2, Judge, so you can follow along with us

22   as we go through them.

23   BY MS. ANDERSON:

24   Q.    You've reviewed Government's Exhibit Number 2, have you not?

25   A.    Yes, I have.

1    Q.    Did you also talk to Ms. Maya MacGuineas?

2    A.    Yes, I have.

3    Q.    When you spoke to Ms. MacGuineas, did she provide you with the

4    e-mail address for her brother, the defendant in this case?

5    A.    One of them, yes.

6    Q.    And could you tell us what that e-mail address is?

7    A.    She confirmed that one of the addresses used is this

8    bmg_357@hotmail.com.

9    Q.    What is her e-mail address?

10   A.    I believe one current one is mayamacg@aol.com.

11   Q.    I would like to go through some of these e-mails.  First of all, let's

12   look at page 1 of the e-mails.  And I've highlighted with pink the

13   pertinent paragraphs on each particular page.

14              MS. ANDERSON:  And, Judge, would you like to take a

15   second to read those?

16              THE COURT:  No.  I'm fine.  Thank you.

17   BY MS. ANDERSON:

18   Q.    So there's e-mails on page 1.  There's also e-mails on page 4

19   that are also highlighted.  Page 6.  Take a look at page 6 and could you

20   read us that e-mail because it's fairly short.

21   A.    The first line says, "The grimness of the situation."  The second

22   line says, "There's going to be a major blood bath, I'll tell you that

23   much."

24   Q.    And that was from whom?

25   A.    It appears to be from the e-mail address that Mr. MacGuineas

1   uses to communicate with his sister.

2   Q.   There is additionally e-mails on page 7.  And also could you read

3   us the subject line on the e-mail contained on page 7.

4   A.   Yes.  It says, "I will be bringing a gun."

5   Q.   Another e-mail is on page 9.  And could you read us that e-mail

6   beginning with the second sentence.

7   A.   As I read it the second sentence begins, "It's no secret that in

8   2000 I wrote a number of people letters explaining that it is now or

9   never.  They chose never.  Since then I have been amassing machine

10  guns (see attached) studying how to kill, hiring Navy SEALS, with the

11  singular intention of killing people who took advantage of me following

12  extensive premeditation.  Perhaps this will make more sense at some

13  point in the future."

14  Q.   Let's look at page 11.  That appears to be a photograph but it is

15  not very clear.

16  A.   Regrettably apparently when I faxed it, it didn't come out with

17  proper contrast.  It's my recollection that this particular photo depicts

18  six assault rifle-type weapons.

19  Q.   Page 12 is the next e-mail.  And could you read us the third

20  paragraph down beginning with "Do you realize."

21  A.   "Do you realize that for the past seven years I have simply been

22  premeditating the killing literally of everyone that took advantage of my

23  misfortune?  My focus is on teaching people to think twice about joining

24  lynch mobs.  That's all."

25  Q.   The next e-mail is on page 14.  There's a list of individuals here

1    within this page, correct?

2    A.    Correct.

3    Q.    Could you explain to us what the individuals listed on page 14 all

4    have in common?

5    A.    I believe -- I'm not familiar with every one of them.  I believe

6    most of them have been involved in some sort of mass killing or mass

7    murder situation.

8    Q.    The first one at the top of the list is Timothy McVeigh?

9    A.    Correct.

10   Q.    Who was responsible for the bombing of the federal courthouse in

11   Oklahoma?

12   A.    Correct.  I believe the federal building.

13   Q.    About halfway down we see the names of Eric Harris and Dillon

14   Kleibold, correct?

15   A.    Correct.

16   Q.    Who were they?

17   A.    They were the two students at Columbine High School who killed

18   classmates.

19   Q.    On the bottom of the list, the last three -- or the second from the

20   last is another individual, Seung-Hui Cho, correct?

21   A.    Correct.

22   Q.    Who was that individual?

23   A.    He was the individual responsible for the Virginia Tech shooting

24   recently.

25   Q.    And the name above his is Charles Carl Roberts IV, correct?

1    A.    Correct.

2    Q.    Who is he?

3    A.    He was the individual who just over a year ago went into an

4    Amish schoolhouse and killed some schoolchildren.

5    Q.    Look at page 15 of the e-mails.  And read for us the sentence

6    that begins "So I have to go with Seung-Hui Cho."

7    A.    "So I have to go with Seung-Hui Cho on this one.  'Deceitful

8    charlatans, all the shit you have given me.  Right back at you with

9    hollow points.'"

10   Q.    And, finally, the sentence that begins with "I keep a hit list."

11   A.    "I keep a hit list of people I intend to kill."

12   Q.    Page 18 of the e-mails, almost at the bottom, "Just to make it

13   perfectly clear."  Could you read that for us?

14   A.    "Just to make it perfectly clear, I am intending to bomb certain

15   buildings and shoot schoolchildren with a machine gun (hasn't been

16   done since 1934 at least.)"

17   Q.    The date of that e-mail was what?

18   A.    Appears to be August 20, 2007.

19   Q.    Again, that was sent by Mr. MacGuineas, the defendant, correct?

20   A.    Yes, it appears to be.

21   Q.    Let's focus on page 22 and 23.  There's an e-mail that begins, the

22   last one, on the bottom of page 22 and it concludes at the top of page

23   23.  Could you read us the last sentence -- last two sentences as they

24   appear on the top of page 23?

25   A.    I believe the last two sentences begin on the bottom of 22.  It

1    says, "I'm not even crazy according to the APA and DSM since I have a

2    thyroid condition.  And the DSM says that excludes mental disorder.  So

3    I am sane and I am going to open fire on schoolyard because big

4    government has left no option more reasonable."

5    Q.    A search warrant was obtained for Mr. MacGuineas' apartment.  Is

6    that correct?

7    A.    That is correct.

8    Q.    Do you know when that search warrant was executed?

9    A.    September 7, 2007.

10   Q.    Did you participate?

11   A.    I did.

12   Q.    And could you describe the configuration of the entryway into the

13   defendant's apartment for us?

14   A.    The apartment was configured in such a way that the front door

15   could not be completely opened.  There was a chest of drawers or some

16   furniture in front of the doorway which created a space where people

17   had to go to the left and walk into the center of the apartment and

18   between furniture on both sides and walls.  There was kind of a hallway

19   of sorts through the center of the apartment.

20   Q.    So was a hallway created by the furniture that was placed by the

21   door?

22   A.    Yes.

23   Q.    Were any weapons found in the defendant's apartment?

24   A.    Yes.

25   Q.    How many weapons?

1  A.     25 complete weapons and a partial of another.

2  Q.     Could you describe the kind of weapons that were found in the

3  defendant's apartment?

4  A.     There were assault rifles, shotguns, handguns both

5  semiautomatic and revolver.  There were machine pistols in the form of

6  uzis and some of the assault rifles were fully automatic.

7  Q.     Based on your information, did Mr. MacGuineas live alone in that

8  apartment?

9  A.     Yes.

10  Q.     How many of the weapons that you have just described for us

11  were fully automatic?

12  A.     Seven.

13  Q.     Was there any ammunition that was found?

14  A.     Yes, there was.

15  Q.     How much ammunition was found in Mr. MacGuineas' apartment?

16  A.     There was a significant amount.  We did not individually count

17  each round, but I estimate a minimum of 10,000 rounds.

18  Q.     Was that ammunition that was designed to fit or to work with the

19  weapons that you found in Mr. MacGuineas' apartment?

20  A.     Yes, it was.

21                 MS. ANDERSON:  That is all I have of this witness, Your

22  Honor.

23                 THE COURT:  Mr. Miranda.

24                         CROSS-EXAMINATION

25  BY MR. MIRANDA:

1   Q.   Good morning, special agent.

2   A.   Good morning.

3   Q.   Now, did you seize computers that were in Mr. MacGuineas'

4   apartment also?

5   A.   Yes, we did.

6   Q.   Have those been analyzed as of yet?

7   A.   No.  That takes a few months.

8   Q.   So at this point you don't know whether -- you don't know what

9   percentage this type of e-mail that was submitted to you is of the total

10  amount of e-mails that are there?

11  A.   No, that's correct.

12  Q.   You will have that information somewhere down the line?

13  A.   Obviously some could have been erased in such a manner that it

14  can't be retrieved to quantify.  Yes, we will have better information.

15  Q.   At this time you are going strictly on these e-mails that were sent

16  to his sister?

17  A.   Correct.

18  Q.   Now, you are aware that he's had a dispute with his sister for

19  quite a long time, right?

20  A.   Yes, that has been pointed out.

21  Q.   And did you find any e-mails so far in your investigation that are

22  addressed to anyone other than his sister with this type of threatening

23  language?

24  A.   Well, there's obviously a list of people that these are going to.

25  But, no, I am not a computer analyst so I don't have that information.

1    Our computer analysts are months behind on analyzing that kind of
2    information.
3    Q.    Did you determine if any of these weapons had been fired
4    recently or anything like that?
5    A.    No.
6    Q.    Is that something that is going to be done as well?
7    A.    It certainly can be, but based on I believe what the government
8    is alleging, they wouldn't necessarily need to be fired recently.
9              MR. MIRANDA:  No further questions, Your Honor.
10             THE COURT:  Thank you.
11             MS. ANDERSON:  Just one brief question, Your Honor.
12                        REDIRECT EXAMINATION
13   BY MS. ANDERSON:
14   Q.    Were the weapons loaded?
15   A.    Some of them were, yes.
16             MS. ANDERSON:  That is all I have, Judge.
17             THE COURT:  Thank you.
18             Thank you for your testimony, sir.
19             Government have any more witnesses?
20             MS. ANDERSON:  Your Honor, we have another physician
21   who's waiting outside.  I'm not sure if the court would like to hear from
22   that doctor as well.
23             MR. MIRANDA:  It is my understanding that doctor only
24   interviewed Mr. MacGuineas for a very short time.  I don't know if it
25   would add anything to this testimony.

1        MS. ANDERSON:  I disagree.  I believe that physician

2   who is outside, Dr. Stoker, evaluated the defendant along with Dr.

3   Newman and he gave the defendant a similar amount of time and

4   attention as did Dr. Newman.

5        THE COURT:  Counsel be willing to stipulate to that or do

6   you want to hear it all over again?

7        MR. MIRANDA:  We will stipulate, Your Honor, that he will

8   say something similar that Dr. Newman would say.

9        THE COURT:  Very well.  I will hear from the government

10  first regarding the recommendation.

11       MS. ANDERSON:  Your Honor, the government

12  recommends detention.

13       First of all, I would point out to the court that the

14  defendant is arrested on charges of 18 U.S.C. 875(c).  The government

15  needs to prove the defendant is a flight risk by a preponderance of the

16  evidence and the government also needs to prove dangerousness by

17  clear and convincing evidence.

18       It's the government's position that we have proven both

19  things to the court.

20       First of all, I point out to the court that 18 U.S.C. 875(c)

21  is considered a crime of violence as defined in 18 U.S.C. 3156(a)(4).

22  Therefore, because it is a crime of violence, the presumption of

23  detention applies in this case.

24       Then at that point, Your Honor, the burden of production

25  shifts to the defendant.  I would submit to the court that the defendant

1    has produced no evidence to contradict or controvert any of the

2    testimony that the government has presented this morning.

3              Your Honor, when we look at 18 U.S.C. 3142(g), it gives

4    us the factors that the court needs to consider when evaluating

5    whether or not an individual should be released or whether they should

6    be detained.

7              The first factor is the nature and seriousness of the

8    offense.

9              In this case, Your Honor, the defendant was sending

10   threatening communications to his sister and also some other

11   individuals who were also included in the string of e-mails.

12             Not only was he threatening those individuals, but he

13   was also threatening to blow up buildings and shoot schoolchildren.  I

14   would submit to the court that these are serious offenses which the

15   defendant is threatening to commit.

16             The second factor included in 18 U.S.C. 3142 is the

17   weight of the evidence.

18             As the court is aware, this is the least important of all of

19   the factors.  I would also submit that the evidence is strong in this case

20   especially given the testimony by the psychiatrist, Dr. Newman.

21             The third factor is the defendant's characteristic, physical

22   and mental condition, family and community ties, employment,

23   financial resources, past conduct, drug and alcohol abuse.

24             This is one of the strongest factors in the government's

25   favor.

1        We heard from the doctor that it is his opinion that the

2   defendant is a danger to the community.  And the doctor explained to

3   us the basis for his opinion, some of which includes the e-mails that the

4   defendant sent, but also his own independent evaluation of the

5   defendant, and based on that, based on the fact that the defendant has

6   no family, no community ties here, his employment consists of running

7   a pornographic site over the computer, and he lacks any kind of

8   financial -- strong financial resources, we believe that this factor weighs

9   in favor of detention.

10        Finally, the last factor is the nature and the seriousness

11  of the danger to any person or the community posed if the defendant is

12  released.

13        The doctor has testified to this directly.  And, again, it's

14  his opinion that the defendant is persistently and acutely mentally ill

15  and, second of all, that he is a danger to the community should he be

16  released.

17        Based on all of the factors, including the fact, Your Honor,

18  when the agents executed the search warrant on his house, they found

19  that he had the means to follow through with all of his threats, they

20  found 25 weapons, seven of which were fully automatic, these weapons

21  were submachine guns, they were uzis, and not only that, but he had

22  the ammunition necessary to carry out the threats that he was making,

23  he had in excess of 10,000 rounds of ammunition in his home, based

24  on everything the government requests detention.

25        THE COURT:  Mr. Miranda.

1          MR. MIRANDA:  Thank you, Your Honor.

2          I would just ask that, you know, we don't have the

3    access to a lot of the computer hard drive as of this point or medical

4    reports that would amplify and to paint a bigger picture of Mr.

5    MacGuineas' total situation.

6          At this point in time, you know, I fully expect the court is

7    going to order him detained based on the testimony of the doctor and

8    the government and the FBI in this case.

9          I would ask that we immediately start within this case to

10   seek mental evaluation of Mr. MacGuineas for his own behalf and for

11   the case to determine exactly what we are dealing with at this time.

12         Mr. MacGuineas in his dealings with me has been rational

13   and he has been coherent and he hasn't exhibited any of the traits that

14   are described, you know, in these reports concerning violence, threats

15   of violence, things of that nature.

16         Based on that I think it is very important that we get the

17   whole picture and I think that has to be done through mental

18   evaluation for competency as well as for the factual basis and elements

19   of this case.

20         Whether that is done by the government, you know, we

21   prefer it be done locally.  I will work that out with the government.

22         Thank you, Your Honor.

23         THE COURT:  Thank you.

24         I am going to adopt the recommendation of pretrial

25   service and order this gentleman's detention as a potential risk of

1    nonappearance.

2              He doesn't seem to have a real stable living arrangement,

3    no visible means of support.  I think he has a gold coin collection and

4    perhaps he may be trafficking in firearms.  I don't know.  But I don't

5    see anything that says that this gentleman is fully and gainfully

6    employed.  It may very well be due to the fact that he has some mental

7    health issues.

8              I will make a finding the government has proven that he

9    is a risk of nonappearance by a preponderance of the evidence.

10             As far as danger to the community or danger to himself

11   and others, I'm also making a finding the government has shown that

12   to be the case by clear and convincing evidence.

13             In this instance we have a situation where we have here

14   a gentleman who is by way of search warrant determined to be in

15   possession of 25 firearms, seven of which are automatic.  I think that is

16   probably in violation of the law.  He has got the ammunition for those

17   firearms as well as other firearms.

18             So he certainly has the ability to cause harm to self and

19   others.  He certainly seems to have the motive as evidenced by the

20   numerous e-mails that have been submitted in Government's Exhibit

21   Number 2.

22             The only thing this gentleman was lacking at that point

23   was the opportunity and it's hard to tell from those e-mails when that

24   opportunity might have arisen, but I am concerned as recently as

25   August 20 or 21 of this year he is making threats and fortunately within

1    17 days a warrant is served and those weapons are discovered.

2         I'm making a finding this gentleman is not only a risk of

3    nonappearance but also a danger to the community and order his

4    detention.

5           If there is an issue of this gentleman being examined

6    under 18 U.S.C. 4241(d), there is a variety of ways it might be

7    approached.

8           One is counsel can make a motion to have him examined

9    initially or counsel can submit whatever medical reports are already in

10    existence and accelerate the process so that if a determination is made

11    that he is presently not competent then he would be ordered

12    committed to a federal medical facility for purposes of potential

13    restoration and/or medication.

14           Those are alternatives present for counsel to consider.

15           Either counsel have anything at this time?

16           MS. ANDERSON:  No, Your Honor.

17           MR. MIRANDA:  Nothing further, Your Honor.

18           THE COURT:  Thank you both for your time.

19           (The proceedings concluded.)

20

21

22

23

24

25

1
2
3                          C E R T I F I C A T E
4
5
6
7            I, Dianne Davenport, certify that the foregoing is a correct
8    transcript from the record of proceedings in the above-entitled matter.
9
10
11
12
13   /s/ Dianne Davenport                    February 8, 2008
14
15
16
17
18
19
20
21
22
23
24
25